All right, we'll call the first case. It's 22-26 v. VI Carnival Committee v. VI Dept. Tourism. Ms. Griffiths? Yes, Your Honor. Good morning. Good morning. I'll press your podium. Sure, Your Honor. You're ready. Good morning, Your Honors. May it please the court, my name is Terry Griffiths. I represent the VI Carnival Committee. In 1952, a small group of Virgin Islanders formed a committee because... Well, you know the history of the case. How do we understand why this is not very simply a situation of... I understand you've got your trademark. I assume you're going to argue that it's therefore incontestable. Well, why isn't this a situation where it is as generic as any trademark I can imagine and descriptive as any trademark I can imagine and therefore not entitled to the protection you're seeking? It is a geographically descriptive composite trademark, just like the Hollywood Carnival or the West Palm Beach Carnival or the Carnival of San Francisco Festival. Well, they're carnivals. They're trademarks. So it is. But we also have an incontestable mark and... But the incontestable doesn't mean much, does it? Because that does not isolate you from all the fences to the enforcement of the trademark. So if we go into the primary significance test, the genus of the trademarks is carnival, as it is in the Hollywood Carnival or the San Francisco Carnival or the Dartmouth Carnival. There's a whole host of them. It's like Coca-Cola. It's like Pepsi-Cola. Pardon me? It's like the cola of Pepsi-Cola. And that's a protected trademark. Because of the Pepsi kind of taste of the cola. Yes, that's true. If I could be either St. Thomas or Virgin Islands together with the Hollywood Carnival, it seems to me you're still on the wrong cola, not Pepsi-Cola, because all the descriptive language does, Virgin Islands and St. Thomas, is tell you which carnival you're talking about. It's not a product in the sense that Pepsi-Cola is a product. Well, Virgin Islands Carnival is also evocative of all of the events during Carnival or all West Indian Carnival Caribbean affairs. But it's a government program. Isn't it a government program? Never. I thought you conceded that. No. Didn't the government subsidize the efforts for years since the inception of the carnival? There were small subsidies in the beginning, small subsidies, but it was never a government program. It was a government-sponsored program. And I haven't found any case law suggesting that a grant provides ownership of an event. But, Ms. Griffiths, I'm not aware of any such authority either. But what you characterize as small subsidies were also supplemented by police protection and other expenses that were covered by the Virgin Islands government, weren't they? Yes, a couple of amenities were provided, just like they are to any other carnival or event in any other city. Sure. I was simply trying to get to the fact that you attempted to minimize the contributions from the government, and they were more than small subsidies. But let me get back to how the questioning really began and hopefully to the nub of this, which seems to be whether or not this is a generic mark. Incontestability really is irrelevant if the determination is and is that this is a generic designation. And I use that word designation because some authorities contend that the term generic mark really is an oxymoron. It's not a mark at all. Yes, Your Honor. And the incontestability of the two marks is not irrelevant because it shifts the burden of proof to the defendants to demonstrate that the marks are indeed generic. But under the primaries… And that was a finding of fact by Judge Molloy, was it not? Yes, subject to the clearly erroneous standard unless the court has a firm conviction that a mistake has been made and then it's reversible. Exactly. So that's really the nub of it, is it not? Aside from the fact that the order of battle that Judge Molloy undertook here, in his opinion, might not have been exactly the way the cases suggest, he got to generic, he made a finding of fact, and that's what this case is all about, isn't it? Well, it seems that it is, Your Honor, but he got to generic bypassing. He dissected the trademarks, which is not… Where does this anti-dissection – maybe you consider it a rule. I haven't found it anywhere in the case law. I've found it in persuasive authorities, perhaps McCarthy references that I believe, but where does it find any kind of support in the jurisprudence? By the U.S. Supreme Court in the estate of P.D. Beckwith, 1920, so it's over 100 years old, and it's followed by McCarthy and any other case you read, they cite to the estate of P.D. Beckwith. So, you know, dissecting the composite trademarks, geographically descriptive composite trademark was a reversible error, number one. Number two… It doesn't necessarily mean it's reversible error because if it is, finding is not a clear error as to the combined terms rather than dissecting it. Well, it's an error if you violate a legal principle set down by the U.S. Supreme Court. Right, but that doesn't mean it's reversible error. He made a mistake in how he looked at the terms and dissected them, but you still have to seem to me establish that it is not, that they have to establish that it is generic law or descriptive. True, and under 1064.3, you apply the primary significance test, and the primary significance test is what is in the mind, not of the buyer association, which is what Judge Malloy said, there's no connection to the buyer association, it's what's in the mind of the relevant public. So, if you're determining what's in the mind of the relevant public, you have to figure out who the relevant public is. So, to figure out who the relevant public is, you have to look at the nature of the Virgin Islands Carnival. The Virgin Islands Carnival is all about Caribbean music, Caribbean dance, so there's a trait there that's evocative of suggestive, descriptive, you know, it's not just a carnival. For example- What you're describing is a carnival. It takes place in St. Thomas in the Virgin Islands, but it is a carnival. Would you trademark the term carnival? Well, Carnival Cruise Lines has. It is trademarked. Just Carnival. They have a trademark for just the word carnival. However, we have a- But they're not a carnival. They're a cruise line, they're not a carnival. Pardon me? Carnival Cruise Line is a cruise line. It's not a festival. It's not a carnival. Actually, they have trademarked the term carnival for entertainment services. I'm well aware of that. Let me go back to this affidavit. There's been quite a bit of discussion as to the affidavit that was submitted in support of the mark. It sounds like the district court was not impressed with the veracity of that affidavit. What can you tell me about this affidavit? Where do we find it? I don't know if it's in the record, but Mr. Callender testified with respect to his declaration of incontestability and the application for the registration. So we put the person who applied for the trademark on the stand, and he discussed whether he had any fraudulent intent when he filled out the application and the declaration for incontestability. So where's the affidavit? Pardon? So the affidavit's not part of the record? Well, Your Honor, all of our records were taken. It's susceptible to a yes or no. It's susceptible to a yes or no answer, and the answer is no, there was no affidavit submitted in the PI hearing. But then the follow-up question would be, did the court close the record, or was there an opportunity to submit something after the PI hearing was held? The court allowed us to do trial briefing. And you submitted what? We allowed trial briefing. And there was no affidavit submitted with the trial briefing, correct? I don't believe so. We submitted the registrations of the incontestability and the registration of the trademark. But going back to primary significance and the relevant public, you have to look at the carnival, and the relevant public, the nature of the carnival, it's one big annual homecoming. It's Virgin Islanders who go to college in the States who don't come back, or it's Virgin Islanders who leave here for the United States for employment. So it's the annual time of the year that all the Virgin Islands get back together. They return to the Virgin Islands. They see their friends. They see their family. It's a homecoming. So the relevant public is the U.S. Virgin Islands people who the judge could have almost taken judicial notice that they know darn well that the source of the Virgin Islands Carnival is the Virgin Islands Carnival Committee. And we did provide evidence. We provided booklets. We provided newspaper articles. Going back to 1960 of the focus on the Virgin Islands Carnival Committee, we also provided booklets that are published annually of all the heads of government writing letters to the Virgin Islands Carnival Committee, which is published in a book. Rather than speak generally, Ms. Griffiths, could you point us to those portions of the record where the evidence that you put in, specifically exhibits, actually mentioned the VICC, actually mentioned the committee? The Virgin Islands Carnival Committee? Yes. Well, there's a booklet from the 1960s that we put into the record. I don't have the citation. All right. Beyond the citation, it's just the exhibits themselves, and if you'd characterize them. Well, the earliest exhibit that we could get our hands on was from the 1960s, and it showed the original Virgin Islands Carnival Committee members. I think most of them were the original, yes. And I had a picture, and it talked about them and talked about how they formed the Virgin Islands Carnival. The carnival was predates the 1960s by… Yes, 1952. Well, even before then, the district court went into a lot of discussion of the history of this. Yes, but the Danish owned the Virgin Islands then. There was no Virgin Islands Carnival in 1912. There was one carnival in 1912. It was not owned by the United States. It wasn't the U.S. Virgin Islands. I don't even think it was called the Virgin Islands Carnival. They had a carnival under Danish rule in 1912. And then in 1952, this prominent group, very prominent, well-respected group of Virgin Islanders formed a committee to form and name the carnival the Virgin Islands Carnival. So, wasn't it, I thought in 2004, the committee conceded that the Virgin Islands Carnival is a program under, at least that's your point of submission, under the Department of Housing, Parks, and Recreation of the Virgin Islands. We never conceded that. Mr. Callender testified in the preliminary injunction that never, ever, so did Mr. Stallard, who's one of the few people left that has any knowledge of the beginning of the Virgin Islands Carnival. So, you're arguing today that the Virgin Islands Carnival as it exists, or has existed, was never a program under the Virgin Islands Department of Housing, Parks, and Recreation? Never. Absolutely not. And when you talk about conceding, that's the case of the Virgin Islands Carnival Committee versus the legislature. And I briefed that extensively. It was basically dicta with a dropped footnote that the judge referred to about some sort of merit, briefing on the merits of the parties which we have yet to get a copy of. There's no procedural standards or no evidentiary standards, no nothing. He just said that the V.I. Carnival Committee's attorney put into a briefing on the merits that the Virgin Islands was some sort of program under Housing, Parks, and Recreation. But that was the principal point of the District Court's opinion about striking this fallout dicta. Actually, it was not. When the Virgin Islands Carnival Committee brought that case, it was more for a deck action that the Inspector General could not audit their books because they weren't a government program. And they had annually provided an accounting for all the taxpayers' money, every dime, for years. But the government, and I want to say government more likely, the senators, weren't happy with that. They wanted a copy of contracts. They wanted the kind of money they were getting from sponsors. And as Mr. Callender and Mr. Seller testified, they were trying to protect their sponsors and their donors and their people like that from basically from senators looking for campaign contributions or for money for pet projects. So they refused to produce it. So they filed that lawsuit. And in the meantime, the legislature amended Title II, Section 29, saying that anybody that received government money could be audited by the government. Now, so they conceded. The Virgin Islands Carnival conceded, moved to voluntarily dismiss. The legislature was dropped out. And the court entertained, you know, he entered that opinion, although they moved to dismiss. In the opinion, they conceded they could be audited if they take government money from then into the future. So the issue became, which wasn't an issue, can we apply this retroactively? So that's when he, the judge, mentioned that the lawyer supposedly conceded that Carnival Committee was under Housing, Parks, and Recreation. And so they could be retroactively audited because Housing, Parks, and Recreation, they had implicitly agreed that Housing, Parks, and Recreation could take a look at their books. So then the judge in that case said, and if Housing, Parks, and Recreation can take a look at their books implicitly, although they never had, so can the Attorney General, I mean, the Inspector General. So that was dicta. It wasn't an issue. They'd already moved to dismiss. There was an amendment that basically, they agreed, mooted their issue. Okay. Judge Smith, any other questions? No, thank you, Judge Restepo. Thank you. We'll see everybody. Mr. Francisco, good morning. Good morning, Your Honor. May it please the Court, Assistant Attorney General Michael Francisco, representing Justice Pacholta, Ian Turnbull, Alfred Hartman, and their official capacities, and the government of the Virgin Islands. Your Honor, the Court is correct. This is a fairly simple situation. And before I talk about the primary significance test, which I'm very thankful the Court brought up, I'd like to frame this that this was a preliminary injunction hearing. The Court was engaging in a delicate balancing act of considering plaintiffs' likelihood of success on the merits without prejudging them. So now stepping to the actual application of the test, I think this is a very esoteric area of the law, as both of those opinions make very clear. It's a very thin dividing line in many cases, especially between generic terms and descriptive terms. Here we have a primarily descriptive, geographically descriptive… But either one would be a defense to the trademark. I'm sorry, Your Honor? You're making it sound as though there would be an important distinction between whether or not it's generic or descriptive, that either one would be enough to overcome enforcement of the trademark. That is true, Your Honor. Of course, with certain descriptive terms, should they achieve legally significant secondary meaning, they can obtain a trademark. Is that important? Yes, Your Honor. In fact, I just want to note that Carnival Cruise Line uses, to the extent they have a trademark, which that is not in the record, but to the extent they do, they don't provide Carnival services. It's not Carnival as we know that to be and what's in the record. It's merely a cruise line that perhaps has some secondary association of the cruise with Carnival in certain contexts and advertisements. But what we're talking about here is Carnival. And as the USPTO found, Carnival by itself is clearly a generic term when used to describe these particular services. When you add Virgin Islands or St. Thomas, you are describing the location of Carnival, but you're providing nothing in terms of sponsorship, source, affiliation, or approval. And to the extent that there may be any of those associations, that would have been with the GBI itself because, as is made clear in the record, the GBI was the sponsor of most, if not all, marketing. When you say sponsor, what do you mean the sponsor of? Sponsor in terms of funding, as the court noted in the decision, provided the lion's share of funding. We put evidence… The counsel has taken a very different position. She suggests there's minimal involvement from the government of Virgin Islands. Your Honor, the record simply does not bear that out. Not only has the court noted that we provide a variety of services, police, water, trash, the funding was directly from the government, regardless of what other private sponsors there may have also been. Your Honor, there was not a percentage put into the record, but the appropriations from the legislature of the Virgin Islands make it clear that they put a lot of money into this. At various points, I think the BICC's own record evidence showed that they would come back to the legislature when they wanted to get additional monies, $250,000 for instance, for a certain Carnival entertainment. And to the extent that the BICC was an administrator, that relationship worked out very well for a long time. It was revived in 1952. The legislature enacted laws, even going back to the 50s, to assist Virgin Islands Carnival in becoming what it is today, a world-renowned Carnival. Mr. Francisco, could I take you back to really a basic step that is at the PI hearing itself, and you began your discussion with us by talking about the procedural, that procedural stage of this case. And we have had some questions and answers concerning the affidavit, which it sounds like counsel for the BICC concedes was not itself put into the record at the PI hearing. I assume you agree with that. Yes, Your Honor. All right, so let me follow up with that then, in emphasizing that this is a PI proceeding, or was, and that the question, at least one of the questions under the prongs for whether or not PI relief should be granted, is the prospect for success on the merits. Isn't it, by virtue of the presentation of the declarations post-hearing, probably sufficient for purposes of demonstrating the likelihood that the BICC here could eventually present such an affidavit? I mean, isn't the affidavit something that we can really dismiss as not being pivotal in the reasoning here, given the procedural stage at which this matter was being heard and decided? Well, Your Honor, there's a lot to that question, so I'll try to give you an answer, but it brings up additional points. I'm sorry I confused it then, because I was actually trying to simplify it, but please go ahead. Well, I want to make a distinction between the declarations that were sent to the USPTO and any sort of declaration regarding incontestability. That would be the affidavit that was alluded to but never actually provided. Now, subsequent to the hearing, there was a submission of a piece of paper at the end of the day, uncertified, not presented at the hearing to be tested on cross-examination, of what appears to be USPTO acknowledging that some affidavit had been submitted. That is not evidence. It apparently did not sway the court, and the fact that no affidavit was put into the record, to me, is telling, because what would have been in the affidavit would not be something I think that the VICC would want everyone to know, which is that they claimed as their own intellectual property, not just the term St. Thomas Carnival and Virgin Islands Carnival, but the entire entire carnival itself, which the court has acknowledged and the record shows began in 1912 at the earliest, you know, and was revived in 1952. Both of those days were well in advance of the VICC even becoming an incorporation. All right, let me get in here and try to simplify what I may have confused with my question, which is, let's simply assume that my earlier question assumed that for PI purposes, what the committee put in was enough. Does that matter, which is to ask then, isn't genericness the pivotal question here, the resolution of which was made by the district judge as a finding of fact, and if that finding is upheld, isn't that for you game, set, and match? Yes, Your Honor, it is, and I would just note for the court that the district court did not prejudge the merits of the plaintiff's claims. They said at best, this is primarily geographically descriptive with no evidence of secondary meaning. At worst, it's purely generic, and our contention is that it was generic, and we are continuing to argue that before the district court. For the purpose of the preliminary hearing, it was clear that on the very first question of the preliminary injunction test, they were not likely to succeed, extremely unlikely to succeed. Now, I had to take the court through the rest of the analysis. None of the factors, in our opinion, would militate or counsel granting a preliminary injunction. In fact, we just had carnival. We thankfully were able to get a great crowd, and it was an economic boon for the territory after years of not just the pandemic, but perhaps mismanagement, carnival. And now that we have a division of festivals within the Department of Tourism, the sky is the limit as far as we're concerned. And using those terms, rather disallowing the government from using those terms, would only cause harm to the public, which the BICC acknowledges is the true and rightful owner of Carnival on St. Thomas. Now, Your Honor, there were a number of points that I'd just like to make. If you have any questions, feel free to interrupt. I didn't think there was any debate about this, and that is whether or not the Carnival was your program under the Department of Parks, Housing, Parks, and Recreation. But that was not tested. Well, Your Honor, it had been initially under the Department of Housing, Parks, and Recreation. Since then, there's been some adjustment with various agencies, and it was determined that placing this under the Division of Festivals, creating the Division of Festivals under the Department of Tourism, because of their attempts to really market this to the world, it was more appropriate. But it's still a government program? Absolutely, Your Honor. As you pointed out, in 2004, there was a court case in which it was decisively determined that this is a government program. In every aspect. Going back to its revival in the 50s, the government was so involved that you could not throw a carnival without it. It goes down the streets of St. Thomas. It's in the parking lot of the District Court at Carnival Village. I mean, separately, I would just note that the concession was the crux of the case. That's as described in the hearing by the BICC's former Executive Director, Mr. Callagher. The court found that it was a government program based on a concession made in a brief. Unfortunately, that was not placed into the record, but the case can clearly be found, and that's exactly what it says. Mr. Francisco, what is your asking us to do? I'm sorry, Your Honor. What is your asking us to do specifically? Your Honor, we would ask that you affirm the District Court's decision to deny the preliminary injunction. Should this court find, as it did, that these terms are generic, or even if it were determined that it's primarily geographically descriptive without secondary meaning, we believe it's also within the court's power to dismiss, have this case remanded with instructions to dismiss altogether. But that's the court's prerogative. At the very least, we would just ask that you affirm the District Court's order denying the preliminary injunction. Following up on the previous question, what is the import, in your view, of the finding of fact, of genericness, notwithstanding the fact that this is only a preliminary injunction proceeding? In terms of finality, what is the import of that finding of fact? Well, again, Your Honor, I think it was incumbent upon the District Court not to prejudge, although it was considering the likelihood of success on the merits. Now, should the VICC be able to gather evidence, perhaps the affidavit, I'm not going to say that there's no chance whatsoever. In fact, I think extremely unlikely is the best way you can put it. But that being said, this court does have the power to rule that the VICC could in no way satisfy the primary significance test. And I would just like to say the court, in its opinion, noted that this is a sliding scale. We're talking about a term or two terms, rather, that are perhaps just on the cusp of reaching primarily geographically descriptive, as opposed to generic, flatly generic. And as we all know, generic terms simply cannot be trademarked because that would create a monopolization on language. It would prevent the VI government from marketing this in the only natural way that it can. And I think that the good faith of the government in allowing this to proceed while using alternative forms or formulations of these words, shows that there's really no other way to market this without using some formulation that includes the location and the event. They simply can't, and that should be of the court's key importance and concern. So we would just ask, again, that you allow us to continue using those terms, at least during the pendency of the litigation. And if the court so chooses, make that determination for the district court. Again, it's an incredibly specialized area of the law. I think the court did a great job of covering the same factors it would have given under the primary significance test. It did talk about buyer association. There was no testimony from locals saying that we associate this with the VICC. And there were no surveys. There was not a Teflon survey. There was nothing to show that anyone would consider the VICC the source, sponsor, affiliate, or approver of the card. That goes slightly to a conclusion. You're arguing we never get there. Your Honor, I believe the court said in A.J. Canfield that that was, in essence, what this primary significance test provides. It was a different formulation. I mean, half of one ticks up the other, but I probably didn't say that phrase correctly. Well, what is the next carnival? And more importantly, what is the marketing ramp-up for the next carnival? Your Honor, we just had a carnival at the end of April. We will have the next carnival next year in April, and I believe the ramp-up, I could be wrong, but I believe it begins towards the beginning of the year. And it takes a lot. There's a lot of efforts that go into place, and marketing materials in particular have to go across the country, in some cases across the world. So they try to plan that as early as possible. If your point is right, how will you market it? Give it the longitude and latitude of St. Thomas and say whatever it is in terms of numbers of degrees, carnival, how do you market it? Your Honor, that's a great question. I think that you hit on exactly the point. There is really no other way without perhaps using longitude and latitude. And I would just say the V.I. government has never sought to trademark these terms because we wouldn't take them from the people. Any business on St. Thomas can market their materials using these same phrases. The newspaper uses these phrases. I mean, it's ubiquitous on the island. And to think that any one entity can claim ownership of these terms or carnival itself is beyond a fail. Judge Smith, anything else? No, thank you. Thank you, Mr. Fusco. Thank you, Your Honor. Good day again. I wasn't minimizing the government's brands to carnival. In the beginning, they were small. When carnival began to grow and the government was getting millions of dollars in return for their investment, the grants became larger. There was a market increase in the 70s because they had a sesquicentennial celebration, so they devoted more to carnival. Housing, Parks, and Recreation, they were never a program under Housing, Parks, and Recreation. The connection with Housing, Parks, and Recreation is they handled the grant money. The grant money all flowed in to Housing, Parks, and Recreation, and then they wrote the checks for different things. As far as the declarations, COST Pharma, Third Circuit Opinion, says in a preliminary injunction hearing, it's customary that they're granted on more informal procedures. Evidence is less strict in a preliminary injunction hearing. Plus, the purpose of a preliminary injunction hearing is to preserve the status quo. There was no preservation of the status quo here. That wasn't even talked about. Because a finding of genericness may result in the loss of rights which could be valuable intellectual property, we never talked about the standard here, but the standard generally is clear and convincing. Judge Posner of the Seventh Circuit said before he remarked, to determine that a trademark is generic unless pitched into the public domain is a fateful step. It's a serious consideration before a court decides something's generic. Although it's a fact issue, the district court never looked at any facts. He simply dissected the terms and said they're generic without looking at the primary significance or the understanding in the minds of the relevant public. Well, in fairness, nobody here, and I think the fact that this panel launched the inquiry it did to the parties certainly underscores the fact that nobody undertook any discussion of primary significance. And certainly you did not in your moving brief, correct? No, because you know what? Even reading it, reading the two cases, the Canfield case and also the E.T. Brown case, it really doesn't fit this case. Well, how does anti-dissection, which again, I would really invite you to give me the specific language from the Supreme Court case that you referred to in response to my earlier question, because interestingly, in really presenting to us a primary argument on anti-dissection, I don't think you have discussed that case. I'm looking at page 57 of your brief where you say that contrary to the anti-dissection rule, the district court found that Virgin Islands or St. Thomas standing alone is geographically descriptive and Carnival is generic. And then you go on to refer to statutory mandates. And this seems to me to be to the extent that we give McCarthy weight and virtually everybody does. That seems to be contrary even to what McCarthy has said, which I understand to have been that a court should look at the components individually and then conclude that as a combination of generic terms, the court goes on to find whether or not there should be protection afforded. I disagree, Your Honor. If you would like me to submit a supplemental brief on the anti-dissection rule, I certainly would. No, I'd like you to give me the language from the Supreme Court case, which you did not find it important enough to put into your brief. Standing here this minute, I can't give you that language. All right. But I can't give you the citation. No, I want the language. Don't have it. I do apologize. When can you give us the language? By the end of the day. All right. If you want to talk about it, that'd be great. Sure. May I finish, Your Honor? Yes, Mr. Francesco, if you can. May I finish? If you can't use the term St. Thomas to describe Carnival, how do they market it? They just say Carnival? And you're supposed to run it off to Baton Rouge or New Orleans or wherever? I guess that's a $64 million question because there were a lot of people. I'd like you to answer it. No matter how much money it might be worth, I'd like you to answer that question. How do they market it? Oh, the government? There's plenty of other names. Like in Canfield, the alternate – can they use this, a competitor use this as an alternate – is there an alternate name or an alternate market? Yeah, they can call it the Virgin Islands Government Carnival. Now, that may throw a wet blanket on the whole thing, but there's plenty of other names they can use. There's – we have a lot of festivals and carnivals in the Virgin Islands, so once you It's a great case – Do they call it Carnival in the Virgin Islands? Pardon? Do they call it Carnival in the Virgin Islands? No, I think it's too similar. We were getting into the element of likelihood of confusion. And there's a really good case out of the Eastern District of Pennsylvania, GEMR – give me one moment – GEMR versus Surrey Seniors – Services for Seniors, Judge Lynn Sitarsky. It's a great case. It looks at an event – What does it say? What does it say? I have 10CV810. I don't have the published guide here. Hopefully – You can include that in your letter today. Okay. But she said at the end of it she concluded because they started an event and it was the Main Line Antique Show – Main Line is the geographical place of the Antique Show – and some of the volunteers decided they were going to hijack that event, and they tried. And she went through the whole analysis, and in the end she said both parties seeking to put on the same Antique Show with the same location, Main Line, at the same time of the year, using the same name, public interest militates at having one show name to avoid confusion on the part of the consumers and potential sponsors. So, there are festivals and carnivals all over the United States that are, you know, Newport, News, Jazz Festival, that are festivals named by the geographical location. For example, I think some of the greatest ones are the whiskey festivals or the whiskey carnivals. I think it's festivals. The Texas – I think you'd find some agreement on this panel with that preference. Well, there's the Tennessee Whiskey Festival, and it's evocative of – I'm not a whiskey drinker, but if I were, I think I was going to get good whiskey in Tennessee. But then there's the Pasadena Whiskey Festival, and it's almost like a contradiction in terms. I mean, Pasadena must have changed since I've been there last. I don't know. But Tennessee is evocative of you're going to get good whiskey. Virgin Islands is evocative of you're going to get Caribbean food, Caribbean dance, Caribbean artists, Caribbean musicians. It's evocative of more than just the location. Otherwise, you know, they have Caribbean festivals other places, but they don't say the Dallas Carnival. They say the Dallas Caribbean Carnival. And then in San Diego, someplace you wouldn't really think about a Caribbean carnival, they have the San Diego Afro-Caribbean Carnival, because the location does not evoke Caribbean flavor or flair. Virgin Islands does. St. Thomas does. And our relevant public are Virgin Islanders returning home, so they can see all their family and friends at the same time. And this is nothing unusual. In the States, after the – But why do you think they make it descriptive? It is descriptive. It's geographically descriptive, but, you know, the Carnival Committee is almost like the Carnival King, Queen, Prince, and Princess. They're almost royalty in the Virgin Islands. I moved here, and within a year, I knew darn well who the Carnival Committee was. If you go to your first carnival, you know who's running the show. And it's not the government. Now, if you look, there's a case, Sturgis Bikeway. I'm not a Harley rider either. But it's the same thing, you know. That, if you ever read about it, it's like ungodly amount of Harley riders show up in Sturgis, South Dakota. And they even had it during COVID. And the government got greedy, and they decided they wanted to control it. When it was – it was Harley rider people who sold Harleys, dealerships that started it. And, you know, they got into an argument over Sturgis Bike Week. But when you say Sturgis Bike Week, everybody knew who was running the show, and it wasn't the government. But they provided amenities, and they made out like bandits, just like the Virgin Islands government is here. They've made millions upon millions upon millions of dollars, but they got greedy and wanted the control. Thank you, Your Honor. Thank you. We'll report to you later.